IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| THE COALITION FOR EQUITY AND EXCELLENCE IN SOUTH CAROLINA HIGHER EDUCATION, an unincorporated ad hoc association, RICHARD McKNIGHT, EVAN WARDLAW, TAYLOR HARDING and ANTHONY SMITH, all in their individual capacities, as a member of the aforementioned Coalition, and as representative members of all individuals similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>THE STATE OF SOUTH CAROLINA and THE SOUTH CAROLINA COMMISSION ON HIGHER EDUCATION, an agency of the State of South Carolina,<br><br>    Defendants. | Case No.: 3:15-cv-00667-CMC<br><br><br><br>**AMENDED COMPLAINT**<br>(Jury Trial Requested) |

Plaintiffs, as named above, by and through the undersigned attorney, allege and state the following claims against the above-named Defendants:

## INTRODUCTION

1. This civil action for injunctive and compensatory relief is brought on behalf of Plaintiffs seeking to prevent the State of South Carolina from continuing to operate its public system of higher education in violation of state and federal laws prohibiting:

discrimination based on race in educational opportunities and prohibiting the maintenance of a dual system of education based on race. This civil action seeks a court order mandating the Defendants to create a public higher education system which ensures that South Carolina State University, the state's only public historically black institution ("HBCU"), is comparable and competitive with the State's traditionally white institutions ("TWIs") in all facets of its operations and programs, enabling it to compete for, be attractive to and provide a quality education, regardless of race of the students who choose to attend it, and it seeks to compensate all the individuals harmed by the unconstitutional conduct of the Defendants.

2. Plaintiffs, all former or current students of South Carolina State University, individually and as representative Plaintiffs for the named *ad hoc* coalition, seek justice from this court under two separate legal theories: Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs allege that Defendants have failed to desegregate South Carolina's *de jure* system of higher education as required by federal law under the framework articulated in *United States v. Fordice*, 505 U.S. 717 (1992). Moreover, the Plaintiffs assert that the State of South Carolina has caused a financial crisis at South Carolina State University by unconstitutionally duplicating and creating unnecessary duplication of programs at TWI's within the State of South Carolina, which has detrimentally impacted the enrollment of students at South Carolina State University and has maintained South Carolina State University in an unconstitutional segregated state. Consequently, the Plaintiffs contend that the market value for their degree or

educational experience has been substantially damaged by the unconstitutional conduct of the Defendants.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 over Plaintiffs' causes of action arising under the Constitution of the United States and 42 U.S.C. § 2000d et. Seq. ("Title VI).

4. Venue lies in the United States District Court for the District of South Carolina, Columbia Division because a substantial part of the events or giving rise to the Plaintiffs' claims occurred in the County of Richland, State of South Carolina because of the Defendants' principal place of business in located in the said county and state.

## PARTIES

5. Plaintiff, THE COALITION FOR EQUITY AND EXCELLENCE IN SOUTH CAROLINA HIGHER EDUCATION ("The Coalition"), is an unincorporated *ad hoc* association, of past and present students of South Carolina State University, which was formed solely for the purpose of challenging the inequitable funding of South Carolina State University and to serve as an organization for the members of this lawsuit, named and un-named. At the time of the drafting of this lawsuit, The Coalition is unincorporated; however, as this lawsuit proceeds, The Coalition may choose to incorporate within the State of South Carolina.

6. Plaintiffs RICHARD McKNIGHT, EVAN WARDLAW, TAYLOR HARDING, and ANTHONY SMITH are all present or former students of South Carolina State University who are resident of the County of Orangeburg, State of South Carolina.

7. All of the Plaintiffs are members of The Coalition for the sole purpose of challenging the inequitable funding of South Carolina State University and for the purpose of challenging the unconstitutional segregated state of their beloved university.

8. Plaintiffs bring this lawsuit individually and in their representative capacities as members of The Coalition and as representative members of all individually situated in the event the Court allows this matter to proceed on the basis of a class action lawsuit.

9. The Defendant STATE OF SOUTH CAROLINA is a sovereign entity/territory within the United States of America. It was the first state to secede from the Union on December 20, 1860, but it was readmitted to the United States on June 25, 1868.

10. As a state within the United States, Defendant State of South Carolina is duty bound to honor all duly enacted federal laws and to obey all mandates of the United States Constitution.

11. Defendant SOUTH CAROLINA COMMISSON OF HIGHER EDUCATION ("CHE") is a duly created agency of the State of South Carolina, created in 1978 by the General Assembly of the State of South Carolina pursuant to Code of Law Section 59-103-10. The mission of the CHE is to coordinate a comprehensive program of higher education for the State of South Carolina. CHE has the responsibility to carry out the mandates of the General Assembly as they relate to higher education, and it is responsible for implementing all federal laws as it relates to higher education.

12. South Carolina State University is not a named party in this lawsuit. However, this institution of higher learning is the central focus of this lawsuit.

13. South Carolina State University ("SCSU") is a historically black university ("HBCU") that was formed in 1896 by the Defendant State of South Carolina for the purpose of educating the black youth of the state. Today, the white student population at South Carolina State University is less than 3%.

14. The formation of SCSU was necessary because the black youths of this state could not, as a matter of law, attend the TWIs that were established within the State of South Carolina.

15. SCSU is located in the County of Orangeburg, State of South Carolina. It is the only state-funded, historically black land-grant institution in the State of South Carolina.

16. SCSU was founded in 1896 as the state of South Carolina's sole public college for black youth.

17. Although regionally accredited by the Southern Association of Colleges and Schools (SACS), the university was placed on probation in June 2014 for failing to meet the accreditor's standards "concerning governing board conflicts of interest and board/administration structure, as well as financial stability and controls."

**GENERAL/BACKGROUND ALLEGATIONS**

18. When the Defendant State of South Carolina formed SCSU in 1896, the legal doctrine of "separate but equal" was the law of the land throughout the United States of America. This legal doctrine was confirmed by the United States Supreme Court in the case of *Plessy v. Ferguson*, 153 U.S. 537 (1896)(hereinafter referred to as "Plessy").

19. The *Plessy* decision allowed the Defendant State of South Carolina to sponsor state segregation in every facet of its citizens' lives, including education.

20. SCSU, which was initially called South Carolina Agricultural and Mechanical Institute was initial formed by the Defendant State of South Carolina in 1872 as part of Claflin University. Then, in 1896, the Defendant State of South Carolina separated it from Claflin and named it the Colored Normal Industrial, Agricultural and Mechanical College of South Carolina. In 1954, it was named South Carolina State College and continued to carry this name until 1992, at which time the leadership of South Carolina voted to name the school South Carolina State University.

21. In 1954, the United States Supreme Court struck down the "separate but equal" doctrine in the landmark case of *Brown vs. Board of Education*, 347 U.S. 483 (1954)(decided May 17, 1954). This case held, in part, that segregation of students in public schools violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

22. Ten years after the *Brown* decision, the United States Congress passed and enacted into law the Civil Rights Act of 1964, which included Title VI, 42 U.S.C. § 2000d, which prohibited discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance.

23. As confirmation of *Brown* and Title VI, the United States Supreme Court decided the case of *U.S. vs. Fordice*, 505 U.S. 717 (1992).

24. Under *Fordice*, the Defendant State of South Carolina is constitutionally under a duty to dismantle former systems of *de jure* segregated higher education.

25. Under *Fordice*, the unnecessary duplication of academic programs at historically black institution and non-historically black institutions of higher learning "was part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and. . . present unnecessary duplication is a continuation of that practice." *Fordice*, 505 at 738.

26. As result of the *Brown* decision, the *Fordice* decision, enactment of Title VI, and the Equal Protection Clause of the Fourteen Amendment to the United States Constitution, the Defendants has and had a constitutional duty to protect the Plaintiffs from the policies and conditions indicative of the former dual system of segregation in higher education.

27. Between 1972 to the present, the Defendant State of South Carolina duplicated programs at traditionally white instructions in the state through an unnecessary duplication of academic programs within the public colleges and universities within the State of South Carolina, to wit:

   a. In 1993, Defendant State of South Carolina transformed Coastal Carolina from a junior college to a comprehensive university. Eventually, Coastal Carolina would duplicate the academic programs of South Carolina State University by offering the same degrees in business, foreign languages, and education. The same business and foreign languages are also unnecessary duplication at Clemson University, USC Columbia, The Citadel, College of Charleston, Francis Marion, Lander, USC Upstate, and Winthrop.

b. After *Fordice* was decided and continuing to the present day, the Defendant State of South Carolina created unnecessary duplication of a computer science programs that harmed the enrollment at South Carolina State University, who also offered a computer science academic program. There unconstitutional and unnecessary duplication of a computer science programs continue to exist at Clemson University, USC Columbia, The Citadel, Coastal Carolina, College of Charleston, Francis Marion, Lander, USC Upstate and Winthrop;

c. Defendant created unnecessary duplication of academic programs in the field of education at USC Columbia, USC Upstate, Coastal Carolina, USC Aiken, Clemson University, College of Charleston, Francis Marion, Lander, and The Citadel.

28. For the past several years, beginning around the year 2007, South Carolina State University was legislatively expected to fund approximately 43% of its budget from student enrollment. However, the enrollment numbers did not come into existence because the Defendant State of South Carolina ensured that there was no need for non-whites to attend South Carolina State University because the academic programs as discussed above were unconstitutionally and unnecessarily duplicated at the traditional white public colleges and universities within the state. Consequently, South Carolina State University was unable to attract a sufficient number of students, including non-black students, into its academic programs, which caused it not to be able to meet its financial needs.

29. Defendant CHE has the duty to ensure that the duplication of academic programs do not occur in violation of constitutional restrains. In order to accomplish this

important constitutional mandate, Defendant CHE reviews the academic programs at senior, comprehensive colleges and universities, including South Carolina State University, on an eight-year cycle. However, between 2000 and 2007, Defendant CHE did not conduct the program reviews due to budget constraints, and by the time the reviews were conducted again in 2007, Defendant CHE noted in its report that the duplication as alleged above existed within the state's higher education system. However no legislative action was taken by the State of South Carolina in order to correct this constitutionally unlawful duplication.

30. In addition to the negative financial impact of the unconstitutional duplication of academic programs, South Carolina State University was also harmed by the arbitrary and capricious method in which the Defendant State of South Carolina funded its public schools of higher education.

31. For example, in the 1970's the Defendant CHE devised a funding formula known the Mission Resource Requirement ("MRR").

32. Defendant CHE stated in a report entitled "*A Review of Parity Funding for South Carolina Higher Education*", dated January 3, 2014, the following:

> Since the early 1990's, there has been a growing disparity across the state's public colleges and universities relative to the actual funding that each institution receives from the state for educational and general (E&G) operational needs. The inequities in state funding for institutions relative to the formula are primarily a product of disparate enrollment growth of South Carolina students across the institutions and inconsistent state support that has not kept pace with that enrollment. Variance in equitable funding exists in South Carolina across the thirty-three institutions as well as among institutions within each of the sectors.

33. The Defendant CHE devised the MRR formula principally to ensure parity in funding of higher education within the State of South Carolina by the legislative and

executive entities of the State of South Carolina. However, noted in the above stated report by the Defendant CHE, "[s]tate funding decisions for South Carolina's higher education institutions have not followed the MRR calculation of need for several years."

34. Instead of using the MRR to ensure parity funding among the state's colleges and universities, the Defendant State of South Carolina arbitrarily and capriciously made funding decisions in a "targeted manner and predominantly from non-recurring or one-time funding source."

35. According to the Defendant CHE, the method of funding used by the Defendant State of South Carolina has "created wide variances in the level of state support relative to the need as calculated with the MRR. This situation is commonly referred to as the parity problem."

36. Currently, the Defendant State of South Carolina continues to use its "targeted manner" of making funding decisions pertaining to higher education institutions within the State of South Carolina. This "targeted manner" of funding is a policy or practice that is traceable to the *de jure* era of racial segregation and discrimination.

**FIRST CLAIM FOR RELIEF**
Violation of Title VI
(Intentional and/or Disparate Impact)

37. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs one through thirty-eight above of this Complaint as though fully set forth herein.

38. All of the Plaintiffs are African American.

39. Title VI states in part the following: "[N]o person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. §§ 2000d to d-4 (1976).

40. South Carolina has thirty-three (33) public colleges and universities, which includes three research universities, ten comprehensive teaching universities, four two-year regional campuses of the University of South Carolina, and sixteen two-year technical colleges. Defendants received federal funding to support the higher education system.

41. Many of the programs at the Defendants' institutions of higher learning participate in a variety of federally funded programs, ranging from research to student loans. As a result of such participation in these federally funded programs, Defendant State of South Carolina and its colleges and universities are governed by the mandate of Title VI.

42. Federal funds to the Defendant State are generally provided into forms: through direct support to colleges and universities, generally for research or facilities and through grants and loans made to students enrolled in postsecondary institutions. Moreover, a substantial portion of the funds received by the Defendants come from the United States Department of Education.

43. Defendants intentionally created unnecessary duplication of academic programs at the public colleges as alleged in paragraphs 27a-c above. The Defendants knew or should have known that such duplication of academic programs would negatively impact the enrollment at South Carolina State University because research data shows

that white students will not chose a HBCU if such program of study can be achieved at a TWI. All of the Defendants' unnecessary duplication of academic programs were created at a TWI within the State of South Carolina.

44. The unnecessary duplication of academic programs consequently caused South Carolina State University to remain a segregated entity of higher learning, and federal funds were used by the Defendant State of South Carolina in order to carry out its unnecessary duplication of academic programs and maintain segregation at South Carolina State University in violation of Title VI.

45. Alternatively, in lieu of intentional discrimination, Plaintiffs allege that the decision to duplicate the academic programs as herein alleged disparately impacted South Carolina State University in a discriminatory and unfair manner because such duplication impacted the enrollment at South Carolina State University more substantial than it impacted enrollment at the TWI's.

46. The duplication of academic programs is a direct result of Defendants' failure to address *de jure* era policy of duplicating programs to maintain a dual, segregated system of higher education. Therefore, the program duplication is "part and parcel" of the prior segregated system of higher education within the State of South Carolina.

47. The segregative effect of the program duplication resulted in reduced enrollment at South Carolina State University which caused it present financial crisis. Plaintiffs make this assertion because the evidence will show that in order for racial desegregation to occur at South Carolina State University, South Carolina State University must offer several programs not offered at TWIs.

48. As a direct and proximate result of the Defendants utilization of federal funds to maintain a de jure system of segregation at South Carolina State University through the duplication of unnecessary academic programs at TWIs, Plaintiffs, as students of South Carolina State University, were denied equal educational opportunities and subjected to discrimination in a segregated educational environment, in violation of Title VI, all because of their race.  Plaintiffs suffered damages in the form of diminished value of their degree received or expected degree to be received from South Carolina State University, emotional damages as a result of the bad publicity recently received by South Carolina State University, threaten loss of their school's accreditation, among other damage all in an amount to be proved at trial.

**SECOND CLAIM FOR RELIEF**
(Violation of Equal Protection Clause)

49. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs one through fifty above of this Complaint as though fully set forth herein.

50. The Equal Protection Clause of the Fourteenth Amendment provides as follows:

    All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

51. All of the Plaintiffs are born or naturalized citizens and enjoy the constitutional protection of the Equal Protection Clause of the Fourteenth Amendment.

52. Under the controlling decision of *Fordice:*

    If the State perpetuates policies and practices traceable to its prior de jure dual system that continues to have segregative effects - whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system - and such policies are without sound educational justification and can be practically

eliminated, the policies violate the Clause, even though the State has abolished the legal requirement that the races be educated separately and has established racially neutral policies not animated by a discriminatory purpose.

53. Defendant State of South Carolina perpetuated a policy and practice of unnecessary duplicating academic programs as previously alleged, and this policy and practice are traceable to its prior *de jure* dual system that continue to have segregative effects and such policies and practices do not have a legitimate educational function. Moreover, the Defendant Commission on Higher Education failed to correct admission practices and policies at the state public institutions which perpetrated segregation at South Carolina State University, to wit, but not all inclusive, it allowed South Carolina State University to use a lower admission standard that the standards used by predominantly white universities.

54. The policy of duplicating unnecessary academic programs and lower admission standards influenced student enrollment decisions or by fostered segregation in other facets of South Carolina State University and such policies are without sound educational justification and can be practicably eliminated.

55. Defendants have continued to operate a segregated system of higher education and continue to take actions to perpetuate that segregated system at South Carolina State University, in violation of the Equal Protection Clause of the Fourteenth Amendment and *Fordice*.

56. The Defendants violated Plaintiffs equal protection rights as a result of an officially promulgated policy involving the financing of higher education in the State of South Carolina, and the Defendants acted with intent or with a deliberate indifference to the rights of the Plaintiffs.

57. As a direct and proximate result of the Defendants' violation of the Equal Protection Clause, Plaintiffs, as students of South Carolina State University, were denied equal educational opportunities and subjected to discrimination in a segregated educational environment, in violation of the Fourteenth Amendment to the United States Constitution, all because of their race. Plaintiff suffered damages in the form of diminished value of their degree received or expected degree to be received from South Carolina State University, emotional damages as a result of the bad publicity recently received by South Carolina State University, threaten loss of their school's accreditation, among other damages all in an amount to be proved at trial.

**AS TO CLASS CERTIFICATION**

Plaintiffs intend to file a separate Motion, complete with the necessary showing for class certification under Rule 23, FRCP and Memorandum moving the Court to approve this matter as a class action.

WHEREFORE, Plaintiffs respectfully request the Court to grant the following relief:

a. Award Plaintiffs a judgment for compensatory damages, for the damages alleged, in the amount to be proved at the trial of this matter, if allowed by applicable law;

b. Appoint a special referee or mediator in order to craft and recommend a remedy to the Court in order to correct the Title VI and constitutional violations as alleged herein;

c. Award Plaintiffs the costs of this action, including the fees and costs of experts and other professionals, together with reasonable attorneys' fees;

d. Grant Plaintiffs such other and further relief as this Court finds necessary and proper, to include injunctive relief as necessary.

Plaintiffs demand a trial by jury on all issues of fact and damages in this action.

At Orangeburg, SC

Dated: April 7, 2015

s/Glenn Walters
GLENN WALTERS, Esquire
1910 Russell Street (29115)
Post Office Box 1346
Orangeburg, SC 29116
Phone: 803 531-8844
Fax: 803 531-3628
FED Bar No.: 06435
Email: glennwalterspa@gmail.com
Attorney for Plaintiffs